IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| ANTHONY BARBER, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil Action No. 4:18-CV-903-O |
| | § | |
| LORIE DAVIS, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

**OPINION AND ORDER**

Before the Court is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by Petitioner, Anthony Barber, a state prisoner confined in the Correctional Institutions Division of the Texas Department of Criminal Justice (TDCJ), against Lorie Davis, director of that division, Respondent. After considering the pleadings and relief sought by Petitioner, the Court has concluded that the petition should be denied.

**I. BACKGROUND**

In June 2013 Petitioner was indicted in Tarrant County, Texas, Case No. 1324070D, with assault of a family member with a previous such conviction following an altercation with his sister, Kimberly Barber, in April 2013. Clerk's R. 10-11, ECF No. 15-10. In March 2015 he was reindicted in Case No. 1407138R, and Case No. 1324070D was subsequently dismissed. *Id.* at 6-7, 60. Prior to trial, the state agreed to waive one of the two felonies alleged in the habitual-offender notice in the indictment if Petitioner pleaded guilty to the offense. Reporter's R., vol. 2, 4, ECF No. 15-6. Subsequently, on September 16, 2015, Petitioner pleaded guilty to the offense and true to one of the two felony convictions alleged in the habitual-offender notice, and, following a trial on punishment,

a jury sentenced Petitioner to 17 years' confinement. *Id.* at 93. Petitioner appealed, but the state appellate court affirmed the trial court's judgment and the Texas Court of Criminal Appeals refused his petition for discretionary review. Docket Sheet 1-2, ECF No. 15-2. Petitioner also challenged his conviction and sentence in a post-conviction state habeas-corpus application, which was denied by the Texas Court of Criminal Appeals without written order on the findings of the trial court. Action Taken, ECF No. 19-1.

## II. ISSUES

Petitioner raises the following four grounds for federal habeas relief:

(1) the state failed to make available all exculpatory evidence for counsel to investigate;

(2) he was denied his Sixth Amendment right to effective assistance of counsel by compulsion to enter his guilty plea;

(3) his guilty plea was induced by coercion due to trial counsel's ineffectiveness and misrepresentation; and

(4) he was denied his Sixth Amendment right to effective assistance of counsel by the failure to urge motions from previous proceedings and obtain a ruling in the reindicted case.

Pet. 6-7, ECF No. 1.

## III. RULE 5 STATEMENT

Respondent believes that Petitioner's claims are exhausted and that the petition is neither barred by limitations or a successive petition. Resp't's Am. Resp. 5, ECF No. 18.

## IV. STANDARD OF REVIEW

A § 2254 habeas petition is governed by the heightened standard of review provided for by the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. Under the Act,

a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court. *See* 28 U.S.C. § 2254(d)(1)-(2); *Harrington v. Richter,* 562 U.S. 86, 100-01 (2011). Additionally, the statute requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. It is the petitioner's burden to rebut the presumption of correctness through clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Finally, when the Texas Court of Criminal Appeals, the state's highest criminal court, denies relief on a state habeas-corpus application without written order, typically it is an adjudication on the merits, which is likewise entitled to this presumption. *Richter,* 562 U.S. at 100; *Ex parte Torres,* 943 S.W.2d 469, 472 (Tex. Crim. App. 1997). In such a situation, a federal court "should 'look through' the unexplained decision to the last related state-court decision providing" particular reasons, both legal and factual, "presume that the unexplained decision adopted the same reasoning," and give appropriate deference to that decision. *Wilson v. Sellers,* --- U.S. ---, 138 S. Ct. 1188, 1191-92 (2018).

**V. DISCUSSION**

    **A. Ineffective Assistance of Counsel and Waiver**

A criminal defendant has a constitutional right to the effective assistance of counsel at trial. U.S. CONST. amend. VI, XIV; *Evitts v. Lucey,* 469 U.S. 387, 396 (1985); *Strickland v. Washington*, 466 U.S. 668, 688 (1984). To prevail on an ineffective-assistance claim in the context of a guilty plea, Petitioner must demonstrate that his plea was rendered unknowing or involuntary by showing

3

that (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's deficient performance, he would not have pleaded guilty and would have insisted on going to trial. *Hill v. Lockhart*, 474 U.S. 52, 56-59 (1985); *Smith v. Estelle*, 711 F.2d 677, 682 (5th Cir. 1983); *see also Strickland*, 466 U.S. at 687. In assessing the reasonableness of counsel's representation, "counsel should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Cullen v. Pinholster,* 563 U.S. 170, 189 (2011) (quoting *Strickland,* 466 U.S. at 690).

Additionally, by entering a knowing, intelligent, and voluntary guilty plea, a defendant waives all nonjurisdictional defects in the proceedings preceding the plea, including all claims of ineffective assistance of counsel that do not attack the voluntariness of the guilty plea. *Smith,* 711 F.2d at 682; *Bradbury v. Wainwright*, 658 F.2d 1083, 1087 (5th Cir. 1981). A guilty plea is knowing, voluntary, and intelligent if done with sufficient awareness of the relevant circumstances and likely consequences surrounding the plea. *Brady v. United States*, 397 U.S. 742, 748 (1970). If a challenged guilty plea is knowing, voluntary and intelligent, it will be upheld on federal habeas review. *James v. Cain*, 56 F.3d 662, 666 (5th Cir. 1995).

The Court construes Petitioner's grounds two and three as attacking the voluntariness of his guilty plea. Petitioner asserts that he was compelled and/or coerced to accept the stipulated plea agreement because counsel failed to adequately prepare for trial by failing to secure exculpatory testimony from eyewitnesses and because counsel advised him "based on the temperance of the judge in communicating terms of plea agreements that resulted in unfilfilled [sic] promises and duties." Pet. 6-7, ECF No. 1. Petitioner raised his claims in his state habeas-corpus application,

which the trial court referred to a magistrate judge for findings and conclusions of law. SHR[1] 17-24, 73, ECF No. 19-2. Toward that end, the magistrate judge ordered Petitioner's lead counsel Lisa Haines and "second-chair" counsel Bryan Wilson to respond to Petitioner's claims via affidavit. Haines filed a thorough affidavit detailing her representation of Petitioner, which is set out, in relevant part, below (any spelling, grammatical, and/or punctuation errors are in the original):

> I was appointed to represent [Petitioner] on the charge of third-degree felony Assault-Bodily Injury of Family Member with a Prior on July 2, 2013 in Cause Number 1324070. It was reindicted under the above Tarrant County Cause Number 1407138 on March 19, 2015. I was subsequently appointed to the re-indicted case on March 27, 2015. The case was enhanced to habitual offender notice with prior convictions of ABI-FM with Prior and Possession of a Controlled Substance with Intent to Deliver 4 - 200 grams Penalty Group One. [Petitioner] also had two previous felony convictions for Assault-Bodily Injury of Family Member with a Prior in 2005 and 2009 and eight previous misdemeanor convictions, all of which could be presented the jury upon conviction, in the punishment phase.
>
> I met with [Petitioner] ten times at the Tarrant County Jail prior to trial on September 14, 2015. [Petitioner] was an intelligent and articulate client. Throughout the pendency of the case. [Petitioner] was actively involved in preparing our defense and preparing cross examination of State witnesses and direct examination of our witnesses.
>
> [Petitioner] alleges that the outcome would have been better for him if he had not plead guilty and proceeded to trial as he did on September 14, 2015. But had [Petitioner] plead not guilty, the evidence the State presented at trial established [Petitioner]'s guilty while our defense witnesses ultimately did not provide details that discredited Kimberly Barber and Rochelle Barber's description of the incident. [Petitioner] would have then faced a range of punishment that *started at twenty five years* in TDC. He received a sentence of seventeen years TDC in our jury trial, because he plead guilty in exchange for limiting the range of punishment to a second-degree felony (two - twenty years TDC).

**Procedural Summary:**

> With trial scheduled to commence of Monday, September 14, 2015, [Petitioner] was arraigned on Friday, September 11, 2015 on the charge of Assault

---

[1]"SHR" refers to the record of Petitioner's state habeas proceedings in WR-89,831-01.

Bodily Injury – Family Member with a Prior Felony Conviction, enhanced to Habitual Offender. [Petitioner] plead not guilty. The following Monday, September 14. 2105, jury selection was scheduled to begin at 9:00 a.m. But prior to jury selection that morning, the State made an offer to reduce the range of punishment to second degree felony (waiving one of the prior convictions listed in the habitual enhancement) in return for [Petitioner] pleading guilty to the felony ABI-FM with Prior and one of the convictions listed in the habitual enhancement. After discussion with [Petitioner] in the holdover cell. [Petitioner] chose to plead guilty.

The following day, [Petitioner]'s daughter, Kashell Woodard showed up for trial. Kashell had spoken with our investigator three times in 2014 but failed to attend witness meetings we held at the family home in 2014 and 2015. She failed to return our many calls during the pendency of the case. When l spoke with her at the courthouse on September 15, 2015, she said that the victim had attempted to strike [Petitioner]. She further stated that the victim had fallen to the ground as a result of the momentum of her swinging arm. Kashell alleged that the victim had caused her own injury. No other person at the scene had ever described this scenario. In learning this information and after a lengthy discussion with Co-Counsel Bryan Wilson and me, [Petitioner] decided he wanted to withdraw his plea of guilty. His request was presented to the Court. The procedural impact of changing his plea back to not guilty was explained by the Trial Court. Further discussion with counsel occurred after which [Petitioner] chose to continue with the trial (where he had plead guilty to the jury). [Petitioner] chose not to withdraw his guilty plea. The Trial Court instructed the jury to find him guilty. After deliberations, the jury followed the judge's instructions and found [Petitioner] guilty. . . .

. . .

**GROUND TWO: [Petitioner] was denied his sixth amendment right to effective assistance of counsel by compulsion to enter his plea of guilt. Counsel for the [Petitioner] stated to the court that she was not prepared to proceed with for trial.**

On the first day of trial, before [Petitioner] decided to plead to guilty and accepted the State's Trial offer, the Trial Court read the Indictment in its entirety to [Petitioner]. The Court then asked him many questions to verify this decision was his and his alone. Additionally, the Court questioned [Petitioner] regarding both cases listed in the habitual offender paragraph again to establish it was the [Petitioner]'s own decision to proceed on only the second count in the habitual enhancement.

[Petitioner] was not compelled to change his plea to guilty. [Petitioner] had a very lengthy discussion with co-counsel Bryan Wilson and me about the evidentiary and procedural aspects of the case, the possible advantages, disadvantages and

consequences of pleading guilty to the jury in exchange for a lower range of punishment, the advantages, disadvantages and consequences of pleading not guilty and restarting the trial with a range of punishment of 25 years to life in Texas Department of Corrections if convicted.

[Petitioner] made an educated decision to plead guilty to the charge in the indictment and one count in the enhancement. Prior to [Petitioner's] decision to plead guilty, co-counsel Bryan Wilson and I thoroughly discussed with [Petitioner] the State's trial offer to waive the habitual enhancement (range of punishment of 25 years to 99 years/life in TDC) in exchange for [Petitioner]'s guilty plea to the indictment and one enhancement (Possession of a Controlled Substance with Intent to Deliver 4-200 grams Penalty Group 1). [Petitioner] understood that the State would waive the other enhancement of Assault Bodily Injury to Family Memher with Prior Conviction, thus limiting [Petitioner]'s the [sic] range of punishment of 2 - 20 years in Texas Department of Corrections. We talked at length about continuing with the jury trial on guilt/innocence with the habitual range of punishment if found guilty. We also talked about the new Trial offer of pleading guilty but with the reduced range of punishment. [Petitioner] was an active participant in the discussion. Since shortly after his arrest, he had been adamant that he wanted to fight to [sic] charge with a jury trial. I was particularly cognizant of his desire for a full trial, so when this offer was presented to us the morning that we were to [sic] ready to begin voir dire, I reviewed once again what the State's witnesses would likely present to the jury, what our witnesses would likely present to the jury, and evidence regarding injuries suffered by [Petitioner]'s sister. We discussed the lack of corroboration **and consistency** among our own witnesses, just as we had known and discussed in the preceding year. We also discussed his daughter's lack of cooperation in trial preparation meetings – failing to attend witness meetings and failing to return our phone calls.

On the first day of testimony, [Petitioner]'s daughter Kashell Woodard showed up. As I described in my responses to [Petitioner]'s allegations in Ground One, Kashell said her aunt had actually been the aggressor. At [Petitioner]'s request, I did ask to withdraw [Petitioner]'s guilty plea. [Petitioner] requested this withdrawal with a full understanding that, if the Court granted [Petitioner]'s request, going forward with the trial would expose him to a minimum of 25 years in Texas Department of Corrections if he were to be found guilty. I expressed my concern that [Petitioner]'s daughter, Woodard, would likely be impeached by the prosecutor regarding her inconsistent version of events. I expressed concern that the jury could conclude she was not truthful and then disregard her testimony. But at no time did I tell [Petitioner] that he should plead guilty (limiting his punishment range to 2 to 20 years) or change his plea to not guilty (and have a full trial the next day, including a punishment range of 25 years to life). Co-counsel and I reviewed with him that as the Trial Court had explained, the judge would grant a continuance for one day if he

7

wanted to go back to his arraignment plea of not guilty. He understood that with the continuance, he would have to [sic] opportunity to start with a new jury, one who had not heard him plead guilty. Throughout our relationship and again in trial, I told [Petitioner] that it was his decision to make. I told him I would not tell him what to do. It was his decision alone to make since he would be the person who had to live with it. I did not tell him at any point prior to or during the trial that he should plead guilty. I had been prepared to proceed with trial on guilt/innocence according to my client's wishes and was prepared for trial at all times.

[Petitioner] alleges that I "had not found the time to adequately investigate by stating (1) had not interviewed any of the witnesses to corroborate [Petitioner]'s version of events that would establish his innocence." [Petitioner]'s assertion is simply not true. We interviewed *every witness* [Petitioner] provided to me prior to trial. Our problem focused on the fact that our witnesses did not provide evidence to provide reasonable doubt for the jury to consider. [Petitioner] further falsely claims "counsel stated she would not be able to locate any of the five witnesses requested . . ." I never made such a statement. Again, we interviewed all potential witnesses long before trial and on several occasions, but they did not provide evidence that corroborated [Petitioner]'s version of events or exonerate [Petitioner].

[Petitioner] was kept abreast of all witness meetings and potential witness testimony throughout the case. In fact, my investigators and I sought out, spoke to and met with potential defense witnesses Anthony Burks, Rochelle Barber, Millard Payne, the minister who lived next door, Kashell Woodard, and [Petitioner]'s father McKinley Harris during the pendency on [sic] the case. We met at Mr. Harris' home twice for several hours at a time. Investigators Cami Grasher and Paula Green met with witnesses and family members on July 14, 2014. Investigator Paula Green and I met again with witnesses and family members on May 22, 2015. There were also one-on-one phone conversations and meetings with some witnesses. We attempted to locate and meet with [Petitioner]'s teenage daughter, Kashell Woodard on at least four occasions. At one point, Investigators Grasher and Green watched Mr. Harris' home for nearly three hours in the hopes of locating Woodard. They were not successful. Investigator Cami Grasher spoke with Woodard on [sic] several times to set up a meeting to discuss her observations. Woodard agreed to attend the meetings, but failed to appear each time. Woodard never disclosed to Grasher the allegation that her aunt, Kimberly Barber, tried to assault [Petitioner] and injured herself as she fell from the momentum of her punch. We learned this on September 15, 2015 when she appeared for trial. We sought the help from [Petitioner] and various family members in locating Woodard's whereabouts and, in the alternative, getting a message to Kashell to have her contact us. When she showed up for trial, she provided a much more detailed versions of events, one never told to the police, the prosecutors, not the defense. As mentioned in my response to Ground One, her details of the events were not consistent with her father, her aunt or any other

8

witness. She was the only person who alleged the victim actually attempted to strike [Petitioner]. She is the only person who said that the momentum from the victim's attempted assault on [Petitioner] caused the victim to fall and injury herself. As I presented in Count One, [Petitioner] himself never alleged the victim attempted to hit him with her hand. [Petitioner] never stated that his sister tried to assault him.

When Woodard told me the day of trial that her aunt tried to strike her father, [Petitioner] had already pled guilty to the jury. Woodard also told me that when she had met with Prosecutor Tim Rodgers, she had told Rodgers these details. I was concerned that this could be *Brady v. Maryland* violation by the prosecutor. Attorney Brian Wilson and I discussed various courses of action with [Petitioner]. Based on Kashell's new information, I told [Petitioner] I could (1) request the withdrawal of [Petitioner]'s guilty plea and seek a mistrial, (2) challenge the lack of disclosure by the State as a Brady violation and request a withdrawal of the guilty plea and seek a mistrial or (3) continue forward with the trial with [Petitioner]'s guilty plea in place. After discussing the situation at length with [Petitioner], [Petitioner] made the decision to withdraw his guilty plea. I then motioned to withdraw [Petitioner]'s guilty plea and requested a new trial.

[Petitioner] misstates his "facts supporting Ground Two" when he writes that I "had not found the time to adequately investigate by stating she had not interviewed any of the witnesses to corroborate [Petitioner]'s version of events that would establish his innocence." [Petitioner] was well aware that we had interviewed all five witnesses 18 months before trial. [Petitioner] also alleges that I told him I would not be able to locate any of the five witnesses. I never told [Petitioner] that I would not be able to locate any of the five witnesses. [Petitioner] was well aware that we had located all the witnesses for trial, but their info was not helpful to our defense. At [Petitioner]'s direction, Anthony Brooks, McKinley Harris and Kashell Woodard all testified for [Petitioner] in the trial. Unfortunately, [Petitioner]'s friend, Anthony Burks could not remember anything about the incident, now two and a half years later. [Petitioner]'s elderly father, McKinley Harris told us that he recalled [Petitioner] as seated in the car while his daughter, Kimberly Barber, was standing outside of the car – totally opposite from any other witness's recollection of events. He came outside when he heard the commotion. lt appeared that he was not an eye-witness to the incident. Mr. Harris was a frail man when we first met with him in March 2014 and his cognitive abilities deteriorated over the course of the two years. No other person recalled Mr. Harris being outside the house at the time of the incident. It was my belief that Mr. Harris' recollection of events was based solely on hearsay, thus his testimony would have [been] challenged as inadmissible under Texas Rule of Evidence 803, if not simply discarded in a trial on guilt/innocence. As trial approached, [Petitioner]'s friend, Millard Payne refused to return our phone calls and could not be located by our investigator. Family members also tried to locate him, all to no avail.

9

[Petitioner] further alleges the Court denied our request for a continuance. The Court provided the opportunity to select a new jury the next day, a jury that would not have heard [Petitioner] plead guilty earlier in the week. [Petitioner] was present in court during the discussion about the continuance. Co-counsel Bryan Wilson and I had a lengthy discussion with [Petitioner] in the hold-over regarding his options. In a new trial a new jury would be chosen, we could present Kashell Woodard's testimony to contest the State's allegation but [Petitioner] would also face a 25-Life sentence if the jury found him guilty and the State proved his prior convictions. He asked questions that demonstrated a clear grasp of options and the potential results. At the end of this discussion, [Petitioner] decided to decline the opportunity to start fresh with a new jury and a new trial the following day. He stated that he wanted to continue with the present jury and with his guilty plea.

**GROUND THREE: [Petitioner]'s guilty plea was induced by coercion due to trial counsel's ineffective and misrepresentation based on the temperance of the judge in communicating terms of the plea agreements that resulted in unfulfilled promises and duties to represent [Petitioner].**

First of all. [Petitioner] was present in Court with all parties when the judge discussed the plea agreement. [Petitioner] was able to assess the Trial Court's demeanor and temperance on his own.

In "Facts Supporting Ground Three," [Petitioner] alleges *I discovered three witnesses* (McKinley Harris, Anthony Burks and Kashell Woodard) on *Sempemher 15, 2015* who could establish [Petitioner]'s innocence. But in reality, these witnesses were not just discovered on September 15, 2015. We first contacted these witnesses eighteen months before trial. [Petitioner] was kept appraised throughout the pendency of the case the witnesses we had interviewed, what information they provided and whether or not their testimony was helpful to [Petitioner]'s defense. [Petitioner] was told that the [sic] McKinley Harris would not be helpful as a witness since his memory is poor, he is frail and easily confused, and his recollection of the events was the complete opposite of any other witness, including [Petitioner] and his sister. Anthony Burks told us (and the prosecutor who had visited him just before trial) that he could not recall anything about the incident that led to [Petitioner]'s arrest. Kashell Woodard told the prosecutor in her March 1 8, 2015 meeting with him that she didn't see anything from the time [Petitioner] was outside of the car until her aunt was on the ground (see answer in Ground One). Kashell Woodard told us she never saw [Petitioner] touch Kimberly Barber. But she never told us that the victim actually tried to assault her father on April 21, 2013 until the day she came to court September 15, 2015.

In many of our jail meetings with [Petitioner], I discussed with [Petitioner] the meetings [with] five potential witnesses, including McKinley Harris and Anthony

10

Burks. I also reminded [Petitioner] *throughout the case* of the difficulty my investigator, were having locating Kashell Woodard and obtaining her cooperation in meeting with me to discuss what, if anything, she saw on April 21, 2013.

My investigators and I met with McKinley Harris and Anthony Burks in person as early as July 16, 2014 and again May 22, 2015 at Mr. Harris' residence. Conversations with both men also took place subsequently, some in the days before the trial began in September 2015. Unfortunately, neither man provided any information that could challenge the victim's account. At [Petitioner]'s direction, both did testify for the defense in the trial though, as did Kashell Woodard. Mr. Harris recollection of [the] event did not match anyone else who was present on April 21, 2013. As stated previously in this affidavit, he recalled seeing [Petitioner] sitting in the car while Kimberly Barber stood outside of the car: this was completely opposite positioning of the two actors when compared to all other people present on April 21, 2013. Anthony Burks, Rachell Barber's boyfriend, was unable to recall anything about April 21, 2013. He told us prior to trial that he had medical problems and does not have a good memory. Burks testified about the things [Petitioner] did to help his parents in their home. He told the jury that Mr. Harris really needed [Petitioner]'s help with medication and household tasks.

As stated in a previous response in this affidavit, Investigator Cami Grasher spoke with Kashell Woodard in 2014 while trying to set up a meeting with me. Grasher arranged a meeting on July 16, 2014 for Woodard and the rest of [Petitioner]'s family at Mr. Harris' home. But Woodard failed to show up for the meeting. Woodard was again invited to the May 22, 2015 witness meeting at Mr. Harris' home but failed to appear. In her own testimony. Woodard admitted to moving around almost every week since her father's arrest in April 2013. Woodard did present her version of the events to the jury. She told the jurors that Kimberly Bailey [sic], her aunt and the alleged victim, tried to hit her father and then fell on her own. She stated that her aunt lied to the police about her father assaulting her aunt She told the jury she confronted her aunt about fabricating the assault by [Petitioner], Kashell's father. But in the State's rebuttal, Kimberly Barber denied any such conversation with Kashell. Ms. Barber acknowledged Woodard was concerned about her father going to prison, but said Kashell never claimed Ms. Barber made up the assault by Woodard's father.

[Petitioner] also claims I sought a continuance to amend the *State's witness list* to include Harris and Burks. I never made such a statement. A defendant is not required to list witnesses for the defense on the any witness list, with the exception of an expert if the proper motion is timely filed by the State.

[Petitioner] also states that "Haines convinced [Petitioner] that (Harris and Burk's) testimony would not carry much weight." I did express my concern that these

11

witnesses' testimony would not provide reasonable doubt for the jurors. Unfortunately, defense witnesses ultimately did not provide details that discredited Kimberly Barber and Rochelle Barber's description of the incident. [Petitioner] had made Mr. Harris was confused and confusing. Even by [Petitioner]'s recollection, Mr. Harris was not outside at the time of the incident. Mr. Burks had no recollection about the facts of the incident. But Anthony Brooks, McKinley Harris, Kashell Woodard were all present for trial and testified for [Petitioner].

[Petitioner] also claimed that he "entered a stipulated plea agreement that would permit exculpatory testimony of Harris and Burks to be heard along with that of Kashell Woodard." I am not clear on what [Petitioner] is describing in this statement. There was no such stipulated agreement that included such language. The stipulated agreement included [Petitioner]'s prior convictions as found in the Indictment he had plead guilty to the jury. [Petitioner] had already plead guilty to the indictment for ABI-FM with Prior before opening statements began.

[Petitioner] further claims "instructions were to be given to the jury with regard to the mens rea pertinent to [Petitioner]'s action and the allegations." I do not understand [Petitioner]'s complaint. But the indictment was read and discussed with [Petitioner] during many of our ten jail visits. It was also discussed on September 11, 2015, prior to his plea of "not guilty" when arraigned before the Court. On September 11, 2015, in open court and on record, when [Petitioner] was arraigned, the Indictment was read to [Petitioner]. [Petitioner] acknowledged his [sic] understood and then plead "not guilty" to the Court on each count and enhancement in the Indictment. On the following Monday, September 14, 2015, after the State's offer to limit the punishment range to 2 - 20 years TDC if [Petitioner] plead guilty, [Petitioner], Co-counsel Mr. Wilson and I reviewed the Indictment, discussed the charge, the offer, what charge [Petitioner] would be required to plead guilty to, and what enhancement the State was offering to waiving if [Petitioner] plead guilty. [Petitioner] then went before the Court and was read the Indictment by the Trial Court. The Trial Court questioned [Petitioner] at length to determine if his plea was made freely and voluntarily. [Petitioner] indicated he understood the charge and the enhancements and that he was making this decision of his own volition. He then plead guilty to the third-degree charge of ABI-FM with s Prior and the PCS with Intent to Deliver 4-200 grams PG 1 in the enhancement paragraph with a Range of Punishment now of 2- 20 years.

[Petitioner] complains that I failed to make the state's offer known to the trial judge and available for the jury . . ." The Judge was aware of the State's offer to proceed on a Range of Punishment of 2- 20 years in exchange for [Petitioner]'s guilty plea. But it is improper to make the State's offer available to the jury.

SHR 45-50, ECF No. 19-2 (emphasis in original) (footnotes omitted) (citations omitted).

12

Haines co-counsel, Bryan Wilson, also responded to the allegations via affidavit, in relevant part, as follows:

> I sat second chair to Lisa after she asked me if I wanted to sit with her on an upcoming trial. . . . Lisa introduced me to [Petitioner] on the first day of the trial. She explained to him that it was his choice if he wanted me to sit with her and also explained how I could help by sitting second chair during the trial. [Petitioner] agreed that it would be a good idea if I sat second chair with Lisa. In fact, Judge Hagerman specifically asked if he consented to me sitting as second chair with Lisa, and [Petitioner] stated that he wanted me to assist her as second chair.
>
> [Petitioner] decided on that because the State had a cooperative victim whose testimony would be consistent with the evidence likely to be presented, which included pictures, statements, and somewhat severe injuries consistent with witness statements. He also decided to plead guilty because he had many prior offenses that were likely to come into evidence. Some of them were felonies and other priors were violent, so Lisa explained that if he was convicted, it would be very unlikely for him to receive the minimum of 25 years in prison after the jury heard about the nature and number of priors. From my understanding, he had been convicted of assaulting family members in Tarrant County at least four times before this offense. Additionally, two of the four prior family assaults were felony convictions.
>
> The next day prior to the State's opening argument, Lisa informed me that a witness had come forward and said that the assault never happened. The witness was [Petitioner]'s daughter Kachelle Woodard (Ms. Woodard). According to Paula Green, she did not have a permanent residence, so she was difficult for the investigators to find. Most of the investigation occurred prior to trial, so I do not know what happened besides the testimony in the record. However, I have used Lisa's investigator Paula Green and know her to be thorough with her investigations. Lisa informed [Petitioner] of the discussion with Kachelle almost immediately after finding out and discussed his options with him at that point. From my understanding, her testimony was different from what she previously told the prosecutors according to Tim Rogers' notes provided that day.
>
> I listened to most of the conversations between [Petitioner] and Lisa. She never pushed or pressured him one way or another at any point. Instead, she would always tell him that he had to make the decision on whether to withdraw his plea and risk the 25 years minimum to life in prison, or accept the prosecutor's offer of waiving the habitual enhancement, which would make his range of punishment between 2 and 20 years. She also discussed how his priors would impact the punishment given by the jury. Additionally, she told him about how withdrawal of plea would mean he could be facing 25 - 99 or life because the prosecutors would not

13

have to follow the agreement. She told him about all of this many times before the plea, after the witness came forward, and after his decision to carry forward with his original plea to the punishment hearing.

Lisa pointed out to [Petitioner] that Kachelle had made prior inconsistent statements that would significantly harm her credibility. As a former ADA herself, Lisa explained that in her opinion, a jury would not believe the new version of the events especially with strong evidence to the contrary. However, she explained that it was [Petitioner]'s right to have a jury trial and that she would ask the judge to withdraw the plea, continue the case, or request a mistrial. At first, he wanted to withdraw his plea, but later he changed his mind when he learned that the prosecutor would not waive the habitual paragraph if he withdrew. Lisa explained his unique set of circumstances, what she believed the best trial and punishment strategy would be at that point. [Petitioner] understood all of this and decided it was not in his best interest to face a minimum of 25 and maximum of 99 years or life in prison. [Petitioner] decided to continue with his guilty plea so the punishment range would be capped at 20 years.

Lisa Haines is passionate about defending the accused. She is intelligent, poised, and a relentless fighter during trial. She is a former ADA and a great attorney. She was not ineffective in defending [Petitioner]. My understanding is that she had been investigating this case since the beginning and has used several investigators to try and find witnesses. I believe that she has met with many witnesses and even visited his family at their home before trial. Though I was uninvolved until the day of trial, I do know that he testified Lisa has met with him "many times" and seemed very happy with everything she had done until he received a stiff sentence from the jury. Based on the severity of this offense with consistent evidence and history, it is my belief is that [Petitioner] made a very smart decision to limit his punishment to 20 instead of withdrawing his plea.

Below is a list of reasons [Petitioner] claims his trial counsel was ineffective along with my response:

    a)     Counsel failed to adequately investigate the case;

        •     I was not involved in the pretrial investigation of this case.

    b)     Counsel failed to interview any witnesses;

        •     The pretrial investigation occurred prior to my involvement with this case. I did observe Lisa interview several witnesses at trial. It appeared that she and Paula had met most of them

and talked with them before trial.

c) Counsel failed to locate five of the witnesses;

- The pretrial investigation occurred prior to my involvement with this case. However, some of the witnesses that showed up confirmed that they had met with Lisa and Paula before trial. The witnesses he chose did not seem to have favorable evidence for the defendant because each story was inconsistent with [Petitioner]'s version and the State's version of what happened.

d) Counsel forced [Petitioner] to plead guilty by not preparing for trial;

- The preparation for trial occurred before my involvement in the case. I prepared with Lisa on the day of jury selection and afterwards. She appeared to know all of the facts in detail without referring to police reports or her notes. Additionally, I listened to all or most of the conversations between Lisa and [Petitioner] during the two days of trial. Lisa never forced him to plea guilty. She never even implied or hinted which way he should decide. Instead, Lisa explained in detail every one of [Petitioner]'s options at each stage of the proceeding. When he asked Lisa to attempt to withdraw his plea, she asked Judge Hagerman for a withdrawal of plea. When [Petitioner] later changed his mind, Lisa informed Judge Hagerman that [Petitioner] had changed his mind. Some conversations seemed to last 45 minutes or an hour as [Petitioner] weighed his options in the holdover cell. Additionally, Judge Hagerman informed him of his rights at each stage both before the plea, after voir dire, and when he decided to keep his plea to avoid the possibility of a much higher sentence.

e) Counsel failed to prepare any exculpatory evidence for trial;

- The trial preparation occurred prior to my involvement. However, I do know that Lisa seemed very well prepared when she explained the case to me. She had an answer for every question I asked. I don't remember any credible exculpatory evidence.

f) Counsel failed to advise the trial court that part of the plea agreement was that the jury be instructed with regard to mens rea pertinent to

15

> [Petitioner]'s action and allegations;
>
> • I don't know what [Petitioner] means by this. [Petitioner] was admonished in front of the court and pled guilty. He also pled true to the enhancement. He admitted to the offense and enhancement in open court both before and after voir dire.
>
> g) Counsel misrepresented the temperance of the trial court;
>
> • I believe [Petitioner] meant temperament (demeanor) rather than temperance. If so, Lisa explained all of [Petitioner]'s options to him. I don't believe Judge Hagerman would decide a legal issue against [Petitioner] because of anger. Instead, Judge Hagerman was patient and accommodating. He allowed extended periods of time for Lisa to explain each stage of the proceeding to [Petitioner] without interruption. Also, Judge Hagerman's temperament was largely irrelevant because the jury would be deciding all of the factual issues in this case, including punishment. [Petitioner] was present to make observations about his temperament.
>
> . . .

*Id.* at 57-61.

Based on counsel's affidavits, which were found to be credible, and the documentary record, the magistrate judge entered the following factual findings:

### FINDINGS OF FACT

*Ineffective Assistance of Counsel*

24. Ms. Haines and her team interviewed every witness provided to them before trial.

25. The witnesses did not provide evidence that corroborated [Petitioner]'s versions or exonerate him.

26. Ms. Haines and her defense team thoroughly investigated this case.

27. There was no exculpatory evidence available to the defense.

. . .

33. There is no credible evidence that counsel's representation fell below an objective standard of reasonableness.

34. There is no credible evidence that a reasonable likelihood exists that the outcome of the proceeding would have been different but for the alleged misconduct.

*Involuntary Plea*

35. [Petitioner] was aware of the trial court's demeanor and temperament before he chose to plead guilty.

36. Ms. Haines was aware of McKinley Harris ("Harris"), Anthony Burks ("Burks"), and Woodard eighteen months before trial.

37. Ms. Haines advised [Petitioner] throughout the pre-trial process as to the witnesses the defense team had interviewed, what information they provided, and whether the information was helpful to the defense.

38. Ms. Haines concluded that Harris would not have been helpful as a witness because his memory was poor, he was frail and confused, and his recollection of the events was the complete opposite of any other witness, including [Petitioner] and his sister.

39. Ms. Haines concluded that Burks would not have been helpful as a witness because he could not recall anything about the incident.

40. Prior to trial, Woodard told Ms. Haines that she never saw [Petitioner] touch the victim but not that the victim tried to assault [Petitioner].

. . .

42. Based on her experience and interviews with Harris and Burks, Ms. Haines advised [Petitioner] that their testimony would not provide reasonable doubt for the jurors.

43. There was no stipulation in the plea agreement that the testimony of Harris, Burks, and Woodard was exculpatory.

44. Ms. Haines' discussions with [Petitioner] were never pushy nor did she pressure him one way of the other.

45. [Petitioner] was facing a minimum twenty-five years confinement if convicted at trial on the offense as charged.

46. [Petitioner] decided to plead guilty after the State offered to limit the range of punishment to two to twenty years confinement.

47. Ms. Haines advised [Petitioner] that it was his decision whether to withdraw his plea and risk twenty-five years to life in prison.

48. Ms. Haines discussed with [Petitioner] his priors and how they would impact the punishment given by the jury.

49. Ms. Haines advised [Petitioner] that, in her opinion, the jury would not believe Woodard's new version of the events.

50. Ms. Haines and Mr. Wilson thoroughly discussed with [Petitioner] the State's offer, the risks of continuing with a jury trial, the likely State's evidence at trial, the defense evidence, and the evidence regarding the victim's injuries.

51. Ms. Haines discussed with [Petitioner] the lack of corroboration and consistency among the defense witnesses, including Woodard's lack of cooperation.

52. Ms. Haines concluded that [Petitioner] made an educated decision to plead guilty.

53. [Petitioner] was thoroughly admonished by the trial court.

54. [Petitioner] advised the trial court that his plea was made freely and voluntarily.

55. The trial court was aware of the State's offer to limit the punishment.

56. Ms. Haines' advice was the result of reasonable trial strategy.

57. Ms. Haines' advice fell within the range of competence required of defense attorneys.

58. There is no credible evidence that a reasonable likelihood exists that [Petitioner] would not have plead guilty and would have insisted on going to trial but for counsel's advice.

59. [Petitioner] presents no credible evidence to support his claim that his plea

> was not knowingly, freely, or voluntarily made.

> 60. There is no credible evidence to overcome the presumption that [Petitioner]'s plea was regular.

3rd Supp. SHR 7-10, ECF No. 15-5 (citations omitted).

Based on these findings, and applying the *Strickland* standard, the magistrate judge concluded that counsel properly investigated the case, interviewed all witnesses, and prepared for trial; that counsel did not force Petitioner to plead guilty; and that Petitioner failed to satisfy either prong of the *Strickland* standard. *Id.* at 12-14. The judge further concluded that Petitioner's plea was freely, knowingly, and voluntarily made and that Petition had failed to demonstrate that counsel's advice fell below the competence demanded of attorneys in criminal cases or that there existed a reasonable probability that he would not have pleaded guilty and would have insisted on going to trial but for the alleged advice. *Id.* at 15. The magistrate judge's findings and conclusions were subsequently adopted by the trial judge who had presided over the trial proceedings and the Texas Court of Criminal Appeals denied relief on the findings of the trial court. SHR 84, ECF No. 19-2.

Petitioner presents no evidence, let alone clear and convincing evidence, in rebuttal. Thus, this Court must defer to the state court's findings. Having done so, the state court's application of *Strickland* was not objectively unreasonable. Nor was its decision that Petitioner's guilty plea was knowingly and voluntarily made unreasonable given the evidence presented in state court. 28 U.S.C. § 2254(d).

**B. Petitioner's Remaining Claims**

Because Petitioner's plea was knowing and voluntary, his *Brady* claim under ground one is waived. *See Matthew v. Johnson,* 201 F.3d 353, 361-62 (5th Cir. 2000) (providing voluntary guilty

plea waives *Brady* claim). His ineffective-assistance claim under ground four, in which he does not allege that counsel's acts or omissions rendered his plea involuntary, is likewise waived.

## VI. CONCLUSION

For the reasons discussed, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 is DENIED. Further, for the reasons discussed, a certificate of appealability is DENIED.

**SO ORDERED** on this 10th day of January, 2020.

_____
Reed O'Connor
**UNITED STATES DISTRICT JUDGE**